**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WALTER BLAYLOCK, | ) | |
| | ) | CASE NO.    1:12-cv-2537 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant. | ) | |

This case is before the magistrate judge by consent.  Plaintiff, Walter Blaylock

("Blaylock"), challenges the final decision of the Commissioner of Social Security

("Commissioner") denying Blaylock's application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).

This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court REVERSES the decision of the

Commissioner remands the case for further action consistent with this opinion.

I.  Procedural History

Blaylock applied for SSI on December 2, 2009 alleging disability as of March 23,

2006 due to bipolar disorder, epilepsy, diabetes, pancreatitis, and borderline glaucoma. The Commissioner denied Blaylock's application initially and upon reconsideration. Blaylock timely requested an administrative hearing.

Administrative Law Judge Kendra Kebler ("ALJ") held an administrative hearing on June 3, 2011.  Blaylock was represented by counsel at the hearing.  Hershel Goren testified as a medical expert ("ME"), and Mark Anderson testified as a vocational expert ("VE").  On June 21, 2011, the ALJ found that Blaylock was not disabled.  Blaylock requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on August 30, 2012, the ALJ's decision became the final decision of the Commissioner.

Blaylock filed an appeal to this court on October 11, 2012.  Blaylock alleges that the ALJ erred because she (1) failed to evaluate Blaylock's complaints of abdominal pain resulting from his chronic pancreatitis and (2) improperly found that Blaylock's alcoholism was material to his disability.  The Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    Personal and Vocational Evidence

Blaylock was born on November 30, 1964 and was 48 years old at the time of the ALJ's decision.  He has a sixth grade education and no past relevant work.[1]

### B.    Medical Evidence

Blaylock has a long history of chronic pancreatitis secondary to alcohol abuse. Between March 23, 2006, the alleged date of disability, and June 3, 2011, the date of

---

[1]    Blaylock reported past relevant work as a press operator.  The ALJ found, however, that Blaylock had no past relevant work.

Blaylock's hearing, Blaylock visited the emergency room and/or was admitted to the hospital for intoxication, symptoms of alcohol abuse, and/or abdominal or epigastric pain caused by pancreatitis secondary to alcoholism on the following dates:  May 12, 2006 (Tr. at 2609-13); May 16, 2006 (Tr. at 2949-51); May 19, 2006 (Tr. at 2946-47); May 28, 2006 (Tr. at 2600-05); June 11, 2006 (Tr. at 2590-99); September 10, 2006 (Tr. at 2588-89); September 13, 2006 (Tr. at 2581-87); October 7, 2006 (Tr. at 2578-80); October 8, 2006 (Tr. at 2574-77); November 1, 2006 (Tr. at 2571-73); January 5, 2007 (Tr. at 2568-70); January 7-8, 2007 (Tr. at 1034-62, 2952-53); January 14, 2007 (Tr. at 2874-80); January 22, 2007 (Tr. at 1015-33); January 29, 2007 (Tr. at 1831-39); March 24, 2007 (Tr. at 997-1014, 2956-58); March 26, 2007 (Tr. at 2954-55); April 3, 2007 (Tr. at 984-96); April 10, 2007 (Tr. at 2565-67); April 11, 2007 (Tr. at 976-83); twice on April 14, 2007 (Tr. at 2560-61, 2562-64); April 15, 2007 (Tr. at 968-75, 2960-61); April 17, 2007 (Tr. at 964-69); April 22, 2007 (Tr. at 2556-59); April 23, 2007 (Tr. at 953-62, 2551-55); April 24, 2007 (Tr. at 2549-50); April 27, 2007 (Tr. at 941-52); May 1, 2007 (Tr. at 2547-48); May 2, 2007 (Tr. at 2542-46); May 4, 2007 (Tr. at 2539-41); May 8, 2007 (Tr. at 934-40); May 9, 2007 (Tr. at 919-33); May 10, 2007 (Tr. at 912-18, 2532-); May 15, 2007 (Tr. at 2529-31); May 16, 2007 (Tr. at 1821-28); May 18, 2007 (Tr. at 898-911); May 20, 2007 (Tr. at 877-97, 2962-64); May 24, 2007 (Tr. at 2523-28); May 29, 2007 (Tr. at 2515-22); twice on June 3, 2007 (Tr. at 2501-05, 2506-14); June 11, 2007 (Tr. at 1811-20); June 14, 2007 (Tr. at 2495-2500); July 1, 2007 (Tr. at 2491-94); July 19, 2007 (Tr. at 862-76, 2965-67); August 5, 2007 (Tr. at 852, 855-61); August 10, 2007 (Tr. at 832-47, 853-54, 2968-69); August 12, 2007 (Tr. at 820-31); August 13, 2007 (Tr. at 1802-10); August 21, 2007 (Tr. at 804-19); August 24, 2007 (Tr. at 793-

3

803); September 26, 2007 (Tr. at 775-92); September 27, 2007 (Tr. at 2970-72);

October 9, 2007 (Tr. at 766-74, 2973-74); October 29, 2007 (Tr. at 756- 65); November

5, 2007 (Tr. at 1795-1801); November 25, 2007 (Tr. at 748-55); January 1, 2008 (Tr. at

738-46); January 16, 2008 (Tr. at 728-37); January 20, 2008 (Tr. at 710-27, 2975-78);

January 28, 2008 (Tr. at 698-709); February 3, 2008 (Tr. at 691-97); February 7, 2008

(Tr. at 684-90); February 8, 2008 (Tr. at 673-82); March 21, 2008 (Tr. at 655-72); March

24, 2008 (Tr. at 1788-93); March 28, 2008 (Tr. at 1863-64); April 9, 2008 (Tr. at 635-54,

2979-82); May 9, 2008 (Tr. at 626-34); May 27, 2008 (Tr. at 617-25); May 30, 2008 (Tr.

at 1779-87); June 24, 2008 (Tr. at 609-16); July 3, 2008 (Tr. at 2485-88); July 13, 2008

(Tr. at 599-608); July 30, 2008 (Tr. at 592-98); August 3, 2008 (Tr. at 574-91, 2983-86);

August 6, 2008 (Tr. at 2479-84); August 15, 2008 (Tr. at 561-73, 2987-91); August 18,

2008 (Tr. at 547-59); August 20, 2008 (Tr. at 1771-1778); August 31, 2008 (Tr. at 1756-

61); September 14, 2008 (Tr. at 534-46); September 18, 2008 (Tr. at 527-33, 2469-73);

September 24, 2008 (Tr. at 517-25); September 25, 2008 (Tr. at 1749-55); October 12,

2008 (Tr. at 502-16, 2992-93); October 13, 2008 (Tr. at 2467-68); October 22, 2008 (Tr.

at 488-501); October 23, 2008 (Tr. at 2994-95); October 28, 2008 (Tr. at 479-87);

October 31, 2008 (Tr. at 469, 472-78); November 3, 2008 (Tr. at 439-68, 470-71, 2996-

3003); November 7, 2008 (Tr. at 429-38); November 16, 2008 (Tr. at 418-28);

November 28, 2008 (Tr. at 409-17); November 29, 2008 (Tr. at 404, 406-08); December

2, 2008 (Tr. at 377-85); December 4, 2008 (Tr. at 332, 364-76, 386-403, 405);

December 9, 2008 (Tr. at 355-63); December 16, 2008 (Tr. at 326, 329-31, 334-51);

December 22, 2008 (Tr. at 317-25); December 26, 2008 (Tr. at 307-16); December 29,

2008 (Tr. at 297-306, 327-28); January 3, 2009 (Tr. at 2461-66); January 5, 2009 (Tr.

4

AT 2449-60); January 21, 2009 (Tr. at 1866-78); January 27, 2009 (Tr. at 2447-48);

February 3, 2009 (Tr. at 2168-90); February 11, 2009 (Tr. at 2191-2203); February 22,

2009 (Tr. at 2442-46); March 7, 2009 (Tr. at 2437-41); March 13, 2009 (Tr. at 2431-36);

March 16, 2009 (Tr. at 2419-30); March 18, 2009 (Tr. at 2414-18); twice on March 20,

2009 (Tr. at 2407-11, 2412-13); April 4, 2009 (Tr. at 3004-10); April 8, 2009 (Tr. at

301213); April 13, 2009 (Tr. at 3011-12); April 14, 2009 (Tr. at 2866-73); April 16, 2009

(Tr. at 2393-2406); April 17, 2009 (Tr. at 3014-15); April 19, 2009 (Tr. at 2386-92); April

21, 2009 (Tr. at 2380-85); May 10, 2009 (Tr. at 2374-79); May 15, 2009 (Tr. at 3024-

25); May 20, 2009 (Tr. at 3023-24, 3026-27);  twice on May 22, 2009 (Tr. at 2839-47,

2848-52, 3032-33); May 23, 2009 (Tr. at 3028-29); June 1, 2009 (Tr. at 2853-65); June

3, 2009 (Tr. at 2369-73); June 7, 2009 (Tr. at 2204-14); June 9, 2009 (Tr. at 2831-38);

June 14, 2009 (Tr. at 2364-68); June 26, 2009 (Tr. at 2356-61, 2824-30); June 30, 2009

(Tr. at 2805-23); July 10, 2009 (Tr. at 2801-04); July 17, 2009 (Tr. at 2354-55); July 29,

2009 (Tr. at 1890-93); August 3, 2009 (Tr. at 2349-53); August 7, 2009 (Tr. at 2215-27);

August 9, 2009 (Tr. at 2791-2800); August 26, 2009 (Tr. at 3034-39); September 13,

2009 (Tr. at 2780-90); September 16, 2009 (Tr. at 2770-79); September 26, 2009 (Tr. at

1862-63); October 29, 2009 (Tr. at 2746-53); October 21, 2009 (Tr. at 1879-89, 2163-

65); October 30, 2009 (Tr. at 2239-46); October 31, 2009 (Tr. at 2737-45); November 5,

2009 (Tr. at 3040-44); November 6, 2009 (Tr. at 2166-67); November 28, 2009 (Tr. at

2718-36); December 3, 2009 (Tr. at 2343-48); December 4, 2009 (Tr. at 2701-17);

December 23, 2009 (Tr. at 2698-2700); December 25, 2009 (Tr. at 2690-97); December

26, 2009 (Tr. at 2678-89); December 28, 2009 (Tr. at 2311-42); January 2, 2010 (Tr. at

2669-77); January 12, 2010 (Tr. at 2660-68); January 14, 2010 (Tr. at 1922-33);

5

January 17, 2010 (Tr. at 1933-37); January 18, 2010 (Tr. at 2646-59); January 22, 2010 (Tr. at 2158-62); February 4, 2010 (Tr. at 1938-53); February 5, 2010 (Tr. at 2247-67); February 6, 2010 (Tr. at 1954-62); February 11, 2010 (Tr. at 2268-76); February 12, 2010 (Tr. at 2307-12); February 13, 2010 (Tr. at 1969-82); February 16, 2010 (Tr. at 2884-86); February 21, 2010 (Tr. at 2638-45); February 27, 2010 (Tr. at 1983-97); March 9, 2010 (Tr. at 1998-2009); March 22, 2010 (Tr. at 3709-14); March 27, 2010 (Tr. at 2010-21); March 30, 2010 (Tr. at 2022-35); April 7, 2010 (Tr. at 2036-47); April 11, 2010 (Tr. at 2048-54); April 14, 2010 (Tr. at 2695-3708); June 5, 2010 (Tr. at 3528-34); June 6, 2010 (Tr. at 3797-98); June 15, 2010 (Tr. at 2055-67); June 17, 2010 (Tr. at 3521-22, 3796-97); twice on July 2, 2010 (Tr. at 2068-86); July 4, 2010 (Tr. at 3680-94); July 5, 2010 (Tr. at 3768-79); July 13, 2010 (Tr. at 2087-2103); July 25, 2010 (Tr. at 2104-16); July 27, 2010 (Tr. at 3535-37); July 28, 2010 (Tr. at 3794-95); August 9, 2010 (Tr. at 2117-26); August 12, 2010 (Tr. at 2556-67, 3793-94, 3809-); August 20, 2010 (Tr. at 2127-42); August 21, 2010 (Tr. at 3538-55); August 24, 2010 (Tr. at 2143-54, 3666-79); August 26, 2010 (Tr. at 3764-67); September 6, 2010 (Tr. at 2659-65); September 17, 2010 (Tr. at 3823-31); September 22, 2010 (Tr. at 3755-63); October 10, 2010 (Tr. at 3634-58); October 29, 2010 (Tr. at 3734-46); November 2, 2010 (Tr. at 3726-33); November 13, 3633-43); November 28, 2010 (Tr. at 3622-32); December 7, 2010 (Tr. at 3791-92, 4453-63); December 17, 2010 (Tr. at 3927-30); December 18, 2010 (Tr. at 3934-36); December 22, 2010 (Tr. at 3938-55); January 19, 2011 (Tr. at 3985-99); January 27, 2011 (Tr. at 4000-10); February 1, 2011 (Tr. at 4417-29); February 8, 2011 (Tr. at 4408-16); February 16, 2011 (Tr. at 4011-24); February 19, 2011 (Tr. at 4391-February 22, 2011 (Tr. at 4368-90); February 27, 2011 (Tr. at 4027-

6

41, 4494-4510); March 2, 2011 (Tr. at 4361-67); March 7, 2011 (Tr. at 4314-22); March

13, 2011 (Tr. at 4042-49, 4511-18); March 18, 2011 (Tr. at 4346-60); March 26, 2011

(Tr. at 4335-45); March 31, 2011 (Tr. at 4525-33, 4802-10); April 8, 2011 (Tr. at 4534-

37); May 5, 2011 (Tr. at 4719-29); and May 13, 2011 (Tr. at 4753-62).[2]  During these

visits, Blaylock often described his pain as 10 on a 10-point scale.

　　　The very great majority of Blaylock's hospital visits included vomiting, a smell of

alcohol, toxicological detection of alcohol, intoxication, and/or self-reported recent

alcohol use.  During these visits, doctors repeatedly diagnosed Blaylock as suffering

from alcohol abuse or alcohol intoxication.  Tr. at 284, 288, 305, 315, 327-28, 329, 332,

334-35, 366, 384, 399, 417, 448, 484, 490, 506, 533, 537, 563, 577, 608, 666, 679, 690,

696, 704, 734, 763, 801, 826, 887, 915, 917, 928, 946, 958, 967, 990, 1019, 1761,

1773, 1789, 1828, 1832, 1862, 1864, 1867, 1880, 1980, 1994, 2007, 2041, 2064, 2082,

2085, 2091, 2113, 2124, 2140, 2152, 2166, 2178, 2200, 2257, 2309; 2345, 2351, 2389,

2396, 2409, 2416, 2433, 2450, 2481, 2502, 2507, 2530, 2545, 2548, 2550, 2557, 2569,

2577, 2589, 2592, 2613; 2685, 2692, 2738, 2751, 2811, 2826, 2842, 2858-59, 2868,

2876, 2951, 3015, 3023, 3029, 3038, 3042, 3521, 3546, 3634, 3660, 3710, 3737, 3764,

3771, 3794, 3798, 3948, 3992, 4016, 4035, 4045, 4316, 4337, 4370, 4393, 4410, 4419,

4502, 4515, 4528, 4589, 4721, 4780, and 4805.  His alcohol use has caused mild

peripheral alcoholic neuropathy.  Tr. at 1892-93.

　　　A number of objective tests confirm Blaylock's chronic pancreatitis.  Abdominal x-

rays on February 5, 2010, June 18, 2010, and March 3, 2011 showed findings

_____

　　　[2]  This list excludes certain emergency room visits which resulted in a diagnosis of
abdominal pain or gastritis of unknown origin.

consistent with chronic pancreatitis. Tr. at 2267, 3583, and 4367.  CT scans on July 4,

2010 and December 17, 2010 also produced findings consistent with chronic

pancreatitis.  Tr. at 3684 and 4118.  Hospital treatment for Blaylock's symptoms of

pancreatitis have typically included the use of IV fluids and such pain relievers as

Dilaudid and Percocet.  *See, e.g.,* Tr. at 2019, 3791-3792.  Blaylock's reports of alcohol

use in relation to his abdominal pain and the opinions of attending physicians link

Blaylock's alcohol use to flare-ups of abdominal pain.  *See, e.g.,* Tr. at 3591.

Blaylock also suffers from back problems.  On October 22, 2008, a CT scan

revealed considerable arthritic changes at C5-6 and C6-7, with mild posterior

subluxation of C5 on C6 and mild arthritic changes at C3-4.  Tr. at 1117-18.  On

January 12, 2010, a CT scan revealed a fracture of the left L1-2 transverse processes

and a bilateral L5 pars defect.  Tr. at 2661-2662.

In approximately May 2009, Blaylock was diagnosed with type 2 diabetes.  Tr. at

1892.  Many of his later emergency room visits include hyperglycemia and/or the

notation that his diabetes is uncontrolled.  *See, e.g.,* 4371, 4432, 4441, and 4454.

Elevated glucose levels sometimes appear with high levels of alcohol.  *See, e.g.,* Tr. at

4386, 4393-94.  On some occasions, high glucose levels are also accompanied by a

failure to take prescribed insulin in addition to drinking alcohol.  *See, e.g.,* Tr. at 4395

and 4431.

Examining psychologists have also diagnosed Blaylock as suffering from

cognitive and affective disorders.  On September 9, 2010, psychologist Richard N.

Davis interviewed Blaylock at the request of the Bureau of Disability Determination ("the

Bureau").  Tr. at 3486-91.  Blaylock said that he was in school only through sixth grade

8

and that he received only failing grades.  He told Davis that he had been employed no more than intermittently, had spent time in prison for burglary, and had been arrested 100 times or more, mostly for misdemeanor offenses against public order.  Blaylock asserted that he had trouble following directions, getting along with people in authority, and getting along with fellow workers.  According to Blaylock, any money he earns is used to buy alcohol.  He stated that he suffered from diabetes, pancreatitis, and high blood pressure and listed his medications as insulin, Neurontin, a medication for high blood pressure that he could not name, and at least one other prescribed medication.

Davis found Blaylock to be generally coherent, with loose verbal structure and some circumstantial and tangential presentation and with some poverty of speech.  He presented information slowly but was responsive to questions with no flight of ideas.  Blaylock reported difficulty sleeping and occasional crying spells.  He also suffered from some depression when he "thinks about having been molested by one of his mother's boyfriends."  Tr. at 3488.  Blaylock reported feeling worthless and hopeless.  In-office tests revealed limitations in short-term memory and the ability to think logically.  Moreover, according to Davis, Blaylock "possesses almost no ability whatsoever to think in the abstract."  Tr. at 3488.  He added that Blaylock "presents as being very limited intellectually.  Rarely do I see a person who signs his name and misspells it."  Tr. at 3489.

On a typical day, according to Blaylock, he will rise at 6:00 a.m., shave and dress, then shower and meditate.  He watches television news and plays with the dog.  He may go grocery shopping with the female friend with whom he lives.  Blaylock and his friend are not in a sexual relationship. His friend is receiving disability benefits, and

9

Blaylock gives her his food stamps.  He does not date, go to classes, or look for work, nor does he visit family.  He has no interests or hobbies.  According to Davis, Blaylock is able to take care of his personal needs, and his appearance is satisfactory.

Davis diagnosed Blaylock's psychological difficulties as alcohol dependence, an adjustment disorder with mixed disturbance of emotions and conduct, and lower borderline intellectual function.  He summarized Blaylock's work-related mental abilities as follows:

1.  The individual is limited in his abilities to relate satisfactorily to others. . . . Not being able to get along with others seems to be an inherent part of his personality and then he has abused alcohol throughout much or most of his life which only exacerbates that situation.  He appears to be markedly impaired in this area.

2.  He is able to understand, remember and follow simple instructions when not under the influence of substances.  However, getting alcohol seems to be his top priority.  He does work around the neighborhood in order to get a few dollars to buy the alcohol.  He appears to be moderately impaired in this area when not under the influence of substances.

3.  He is limited in his abilities to maintain attention, concentrate, persist at tasks and perform them because of seemingly being under the influence of substances much or most of the time.  It would seem to this examiner that his intake of alcohol is limited only to that extent of his having very little money to buy alcohol.  He appears to be moderately impaired in this area.

4.  He has difficulties dealing with the stresses and pressures associated with his day to day living.  He says he is always depressed.  He appears to be moderately impaired in this area.

Tr. at 3489-90.  Davis opined that Blaylock would not be capable of managing any benefits and assigned him a Global Assessment of Functioning ("GAF") of 55.[3]

---

[3]  A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

On April 4, 2010,[4] Willa Caldwell, M.D., completed a Physical Residual Functional Capacity Assessment of Blaylock.  Tr. at 3471-78.  Dr. Caldwell found that Blaylock could lift or carry up to 50 pounds occasionally and up to 25 pounds frequently. She also found that he could stand or walk for 6 hours in a normal eight-hour workday, sit for hours in a normal eight-hour workday, and was unlimited in his ability to push or pull.  She concluded that Blaylock had no postural, manipulative, visual, communicative, or environmental limitations.  A reviewing physician, Maria Congbalay, M.D., affirmed this opinion on January 19, 2011.  Tr. at 3838.

On September 21, 2010, Aracelis Rivera, Psy.D., completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique assessing Blaylock's mental capabilities.  Tr. at 3496-3513.  Dr. Rivera found Blaylock to be suffering from organic mental disorders, an adjustment disorder with mixed disturbance of emotions and conduct, continuous alcohol dependence, and borderline intellectual functioning.  She opined that Blaylock is moderately limited in the ability to understand and remember short and simple instructions; moderately limited in the ability to carry out very short and simple instructions; moderately limited in the ability to maintain attention and concentration for extended periods; moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; moderately limited in the ability to work in coordination of proximity with others without being distracted by them; moderately limited in the ability to make simple work-related decisions; moderately limited in the ability to complete a

---

[4] The year is not entirely certain, as the transcript page number "3478" obscures the last two digits of the year of the assessment.

11

normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to accept instructions and respond appropriately to criticism from superiors; moderately limited in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; moderately limited in the ability to respond appropriately to changes in the work setting; moderately limited in the ability to travel to unfamiliar places or use public transportation; markedly limited in the ability to understand and remember detailed instructions; markedly limited in the ability to carry out detailed instructions; markedly limited in the ability to interact appropriately with the general public; and markedly limited in the ability to set realistic goals or make plans independently of others. According to Dr. Rivera, Blaylock is moderately restricted in his activities of daily living; has moderate difficulties in maintaining social functioning; and has moderate difficulties in maintaining concentration, persistence, and pace.  She concluded:

> The clt can perform [simple repetitive tasks] in a non-public wk setting where changes are infrequent and he is not expected to perform tasks w rapid speed or to meet strict wk production quotas. . . . With increased sobriety his functioning is likely to improve.  He should not wk in establishments that sell alcoholic beverages or in places where he may have easy access to alcohol.

Tr. at 3499 (abbreviations in the original).

A reviewing psychiatrist, Katherine Fernandez, Psy.D, affirmed Dr. Rivera's opinion on January 19, 2011.  Tr. at 3839.  In addition, Dr. Fernandez noted that in several respects Blaylock's behavior undercut the credibility of his complaints of pain and supported a belief that those complaints were merely attempts to receive pain medication.

12

C.    *Hearing*

At the hearing, Blaylock testified that he had been sober for almost two months. Tr. at 64, 71.  He credited Ability for enabling him to forego alcohol, although Abilify did not lessen the depression which had been causing him to drink.  Tr. at 64-65.  Blaylock also testified that his depression also gives him "impulsive energy," and that he isolates himself to avoid directing that energy at others.  Tr. at 65.  He stated that although he watches television, he merely stares at it rather than paying attention.  Tr. at 65.  He is unable to concentrate on reading.  Tr. at 65-66.  According to Blaylock, he suffers from chronic and debilitating stomach pain that involves his pancreas, wraps around to his back, and creates nauseating pain in his groin.  Tr. at 66-67.  He added that this pain incapacitates him and frequently causes him to go to the hospital.  Tr. at 67-68.

Blaylock stated that for the past six months he has had trouble with his left shoulder and left hand, which is his dominant hand.  Blaylock testified that he was unable to pick up a cup of coffee, turn a door knob, or tie a shoe.  Tr. at 68.  He further testified that he was unable to work a 40-hour week, stand for more than 20 minutes, or sit for more than 20 minutes.  Tr. at 68-69.  He thought that he could not lift more than 15 pounds or that it was not safe for him to drive a car.  Tr. at 70.  Blaylock testified that he was currently taking Abilify, Lisinopril for high blood pressure, hydroxine for anxiety, and Tramadol and Percocet for pain.  Tr. at 80-82.

The ALJ asked the VE to imagine a hypothetical individual with no past relevant work experience and marginal education, limited to light work, unable to climb ladders or scaffolds, unable to kneel, unable to perform fine fingering with the left hand, and who could reach forward, overhead, or to handle with his left hand only as an assist.  The

13

ALJ further limited the hypothetical individual to simple and repetitive tasks and limited the individual to work that did not involve commercial driving, did not involve exposure to such hazards as heights or heavy machinery, did not involve more than occasional and superficial interaction with the public, was relatively unchanging in work setting, was low stress, and was familiar and static in tasks and demands.  When asked if there were jobs that such an individual could perform, the VE responded that such an individual could perform the job of machine tender, injection molding machine tender, blow molding machine tender, and some others. Tr. at 85-86.  When the ALJ limited the hypothetical to *very* simple repetitive tasks, the VE opined that there would be no commercial work for such an individual.

Blaylock's attorney asked the VE if the hypothetical individual could perform the above-stated jobs if the individual were limited to the sedentary level of exertion, and the VE responded, "[T]hat's going to erode the base away."  Tr. at 87.  When asked if there would be work for the hypothetical individual if he would miss work for one day a week, the VE answered that there would not be.

The ME testified that Blaylock has not had seizures since 2009 and that he currently suffered from chronic pancreatitis, left radial neuropathy that Blaylock declined to treat, substance abuse, and an alcohol-induced mood disorder.  Tr. at 90-92.  He also noted that Blaylock suffered from diabetes but that it was not accompanied by sufficient complications to constitute a severe impairment.  Tr. at 93.  The ME also found that while a diagnosis of left radial neuropathy existed in the record, there was insufficient evidence to determine its extent or whether it persisted to the present.  Tr. at 93-94.  When the ALJ asked whether any of Blaylock's medically-determinable

14

impairments meet a listed impairment at 20 CFR Ch. III, Part 404, Subpart P, Appendix 1 ("the listings"), he responded that Blaylock's alcohol-induced mood disorder would meet the listing for 12.04A1 in combination with 12.09.  Tr. at 92.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent him from doing her past relevant work, the claimant is not disabled.  For the fifth

15

and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In determining that Blaylock was not disabled, the ALJ made the following relevant findings:

1.  Mr. Blaylock has not engaged in substantial gainful activity since December 2, 2009, the application date (20 CFR 416.920(b) and 416.971).

2.  Mr. Blaylock has the following severe impairments:  alcohol dependence, chronic pancreatitis, diabetes, left sided neuropathy, history of seizure disorder, and alcohol induced mood disorder.

3.  Mr. Blaylock does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, I find that, based on all of his impairments, including the substance use disorder, Mr. Blaylock has the residual functional capacity to perform less than the full range of light work as defined in 29 C.F.R. § 416.967(b).  Specifically, he can lift 10 pounds frequently and 20 pounds occasionally.  He can stand or walk for 6 hours of an 8-hour workday and sit for 6 hours of an 8-hour workday. He can occasionally climb stairs or ramps but he cannot climb ladders or scaffolds.  He cannot kneel.  He can reach forward or overhead or handle using his left hand only as an assist.  He cannot perform fine fingering with the left hand.  He cannot do work that involves commercial driving or exposure to hazards such as unprotected heights or uncovered industrial machinery.  He is limited to simple 1-3 step tasks.  He is not able to carry out or remember detailed instructions, or to keep an ordinary routine without special supervision, or to make simple work-related decisions. The work should have no interaction with the public, and involve no changes in the work setting or tasks.

5.  Mr. Blaylock has no past relevant work.

16

6.    Mr. Blaylock was born on November 30, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the date he filed the application.

7.    Mr. Blaylock has a marginal education and is able to communicate in English.

8.    Transferability of job skills is not an issue because Mr. Blaylock does not have past relevant work.

9.    Considering his age, education, work experience, and residual functional capacity based on all of the impairments, including the substance abuse disorders, there are no jobs that exist in significant numbers in the national economy that he can perform.

10.   If Mr. Blaylock stopped the substance use, the remaining limitations would cause more than a minimal impact on his ability to perform basic work activities; therefore, Mr. Blaylock would continue to have a severe impairment or combinations of impairments.

11.   If Mr. Blaylock stopped the substance use, he would still not have an impairment or combination of impairments that meets or medically equals any of the listed impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

12.   If Mr. Blaylock stopped the substance use, he would have the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 416.967(b).  Specifically, he can lift 10 pounds frequently and 20 pounds occasionally.  He can stand or walk for 6 hours of an 8-hour workday and sit for 6 hours of an 8-hour workday.  He can occasionally climb stairs or ramps but he cannot climb ladders or scaffolds.  He cannot kneel.  He can reach forward or overhead or handle using his left hand only as an assist.  He cannot perform fine fingering with his left hand.  He cannot do work that involves commercial driving or exposure to hazards such as unprotected heights or uncovered industrial machinery.  He is limited to simple, routine repetitive tasks in a low-stress relatively unchanging environment, defined as work that is familiar and static in its type of tasks and demands, with no more than occasional and superficial interaction with the public.

13.   As indicated above, Mr. Blaylock does not have past relevant work.

14.   As indicated above, transferability of job skills is not an issue because Mr. Blaylock does not have past relevant work.

17

15.  If Mr. Blaylock stopped the substance use, considering his age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that Mr. Blaylock could perform.

16.  Because Mr. Blaylock would not be disabled if he stopped the substance use (20 C.F.R. § 416.920(g)), Mr. Blaylock's substance use disorder is a contributing factor material to the determination of disability.  Thus, Mr. Blaylock has not been disabled within the meaning of the Social Security Act at any time from the date he filed the application through the date of this decision.

Tr. at 36-56.  The ALJ rejected the ME's opinion that Blaylock's alcohol-induced mood disorder would meet the listing for 12.04A1 in combination with 12.09.  She also found Blaylock to be credible with respect to his limited abilities to concentrate and get along with others, but she found that his statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ALJ's residual functional capacity assessment.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

18

Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Blaylock argues that the ALJ erred because she (1) failed to evaluate Blaylock's complaints of abdominal pain resulting from his chronic pancreatitis and (2) improperly found that Blaylock's alcoholism was material to his disability.  The Commissioner denies that the ALJ erred.

*A.    Whether the ALJ properly evaluated Blaylock's claims of abdominal pain*

Blaylock contends that the ALJ failed properly to evaluate Blaylock's claims of abdominal pain due to chronic pancreatitis.  The Commissioner rephrases this argument as an allegation that the ALJ failed to evaluate Blaylock's subjective complaints related to his physical impairments and denies that the ALJ so erred.

The Sixth Circuit in *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994), most clearly stated the test which courts must use in reviewing the Commissioner's determinations of the credibility of an applicant's statements about pain and disability.  The court reviewed the pertinent regulations at 20 C.F.R. § 404.1529 and summarized the applicable test as follows:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition;  or (2)  whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* at 1038-39 (quoting *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  The court specifically noted that the second part of this test is satisfied if the plaintiff satisfies either alternative after finding objective evidence of an underlying medical condition.  Thus, the test "does not require . . . 'objective evidence of

19

the pain itself.'"  *Felisky*, 35 F.3d at 39 (quoting *Green v. Schweiker*, 749 F.2d 1066,

1071 (3d Cir. 1984)) (footnote omitted).  The court also summarized the factors that

should be considered in determining whether the established medical condition can

reasonably be expected to produced the alleged disabling pain:

> (i) Your daily activities . . .
> (ii) The location, duration, frequency, and intensity of your pain . . .
> (iii) Precipitating and aggravating factors . . .
> (iv) The type, dosage, effectiveness, and side effects of any medication you take
> or have taken to alleviate your pain or other symptoms . . .
> (v) Treatment, other than medication, you receive or have received for relief of
> your pain . . .
> (vi) Any measures you use or have used to relieve your pain . . .

*Felisky*, 35 F.3d at 1039-40.  The court added that "the opinions and statements of the

claimant's doctors" are also relevant to the Commissioner's and the reviewing court's

determination.  *Id.* at 1040.  In addition, credibility becomes a particularly important

consideration at the second step of the analysis, and the court will generally defer to the

ALJ's credibility assessment.  *See Walters*, 127 F.3d at 531.

In the present case, the ALJ properly described the two-stage test laid out in

*Felisky* and *Duncan*.  He then stated the following:

> If Mr. Blaylock stopped the substance abuse, I find that his medically
> determinable impairments could reasonably be expected to produce the alleged
> symptoms; however, his statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the extent they are
> inconsistent with the residual functional capacity assessment for the reasons
> explained below.

Tr. at 48.  In three subsequent paragraphs, the ALJ discussed Blaylock's alleged

inability to concentrate and his inability to be around others, concluding with "Mr.

Blaylock's ability to concentrate and get along with others would improve if he stopped

using alcohol, and that without alcohol . . . he is capable of performing simple, routine

20

repetitive tasks . . . ."  The ALJ's concluding paragraph of his analysis reads as follows:

> In sum, the above residual functional capacity assessment is supported by Mr. Blaylock's activities of daily living, the objective medical evience, the report from the examining psychologist . . ., the State Agency physicians' opinions . . ., and the State Agency psychologists' opinions . . ., all of which suggest greater sustained capacity than described by Mr. Blaylock.  Mr. Blaylock's subjective complaints and alleged limitations are not fully persuasive and he retains the capacity to perform work activities with the limitations set forth above.

Tr. at 49.

The ALJ does not recite Blaylock's allegations of pain; does not examine whether objective medical evidence in the record confirms the severity of the alleged pain arising from Blaylock's pancreatitis; does not examine whether Blaylock's pancreatitis is of such a severity that it can reasonably be expected to produce the alleged disabling pain; and does not use any of the factors suggested by *Felisky* to assess the credibility of Blaylock's allegations of pain.  Indeed, the only discussion of Blaylock's pain appearing in the reports referenced by the ALJ appears in Dr. Caldwell's Physical Residual Functional Capacity Assessment and consists entirely of the following:  "Assessment: Acute on abdominal pain," Tr. at 3473, and "[Blaylock] does complain of pain which is in excess of the objective findings and considerd [sic] partially credible," Tr. at 3476.  As this assessment says nothing regarding the extent to which Blaylock's allegations regarding his admittedly acute abdominal pain are credible, and as Dr. Caldwell offers no basis for her opinion, this is far too slim a reed to support the ALJ's RFC assessment.

Given that Blaylock often described his pain to emergency room personnel as a 10 on a scale of 10 and given the strength of the pain medications with which he was treated, any assessment of Blaylock's RFC deserves an explicit and thorough

examination of the credibility of his allegations of pain.  The ALJ has not performed such

an analysis.  For this reason, the case must be remanded to the ALJ for a proper

analysis of the credibility of Blaylock's allegations of pain and a reassessment of his

RFC in light of that analysis.

B.      *Whether the ALJ improperly found that Blaylock's alcoholism was material to his disability*

Blaylock contends that the ALJ erred in finding that his alcoholism was material

to his disability because, according to Blaylock, his condition would not improve if he

were to stop drinking.  The Commissioner denies this contention.

The Act prohibits an individual from receiving disability benefits if drug or alcohol

abuse is a contributing factor material to the individual's disability.  42 U.S.C. §§

423(d)(2)(C), 1382c(a)(3)(J).  When the ALJ determines that an individual is disabled

and the record demonstrates a history or drug or alcohol abuse, the ALJ must

determine whether the individual's substance abuse is a contributing factor to the

determination of disability and whether the individual would still be disabled if the

substance abuse stopped.  20 C.F.R. §§ 404.1535(a), 416.935(a); *see also* SSR 13-2P,

2013 WL 621536; SSR 82-60.  If the ALJ determines that a claimant would still be

disabled if the substance abuse stopped, the ALJ must conclude that the substance

abuse was not a contributing factor material to the determination of disability and should

award benefits.  20 C.F.R. §§ 404.1535(b)(ii), 416.935(b)(ii).  But if the ALJ determines

that a claimant would not be disabled if the substance abuse stopped, the ALJ must

conclude that the substance abuse was a contributing factor material to the

determination of disability and should not award benefits.  20 C.F.R. §§ 404.1535(b)(i),

416.935(b)(i).

In determining whether a claimant would be disabled if the substance abuse stopped, the ALJ's method varies depending upon whether the claimed impairment is physical or mental.  If a claimant has a physical impairment and the ALJ determines that the impairment is the sort that is likely to improve with abstinence, the ALJ may consider the medical opinions of treating or nontreating sources regarding the likely effects that abstinence would have on the impairment.  SSR 13-2P, 2013 WL 621536 at *7.  The ALJ may not adopt a medical opinion about whether the impairment would improve unless that opinion is supported, although the opinion may legitimately be supported solely by the medical source's knowledge and expertise.  The relevant social security ruling emphasizes that the burden is always on the plaintiff to prove disability, but the section of the ruling addressing the probable results of abstinence on physical impairments ends with the following paragraph:  "We will find that DAA[5] is not material to the determination of disability and allow the claim if the record is fully developed and the evidence (including medical opinion evidence) does not establish that the claimant's physical impairment(s) would improve to the point of nondisability in the absence of DAA."  SSR 13-2P, 2013 WL 621536 at *7.

If the claimant has a mental impairment, the method is somewhat different.  The regulations hold that research data cannot be used to reliably predict whether any given claimant's disorder would improve if the claimant abstains from substance abuse.  Thus, although the ALJ must determine whether the substance abuse is material to the

---

[5] "DAA" stands for "Drug Addiction and Alcoholism."  *See* SSR 13-2P, 2013 WL 621536 at *1.

claimant's disability, and ALJ may not rely "exclusively on medical expertise and the nature of a claimant's mental disorder."  SSR 13-2P, 2013 WL 621536 at *7.  Rather, the ALJ must follow the usual case development rules and procedures in assembling evidence of whether substance abuse is material to disability.  *See* 20 CFR §§ 404.1512, 404.1513, 416.912, and 416.913.  In addition, periods of abstinence are relevant to determining what a claimant's RFC would be in the absence of the substance abuse.  SSR 13-2P, 2013 WL 621536 at *7.  Again, the section of the relevant social security ruling addressing the probable results of abstinence on mental impairments ends with the following paragraph:  "We will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA."  *Id.*

The ALJ must provide sufficient information so that a subsequent reviewer considering the evidence in the record can understand the reasons for the ALJ's determination regarding materiality and whether the claimant would be disabled if the claimant stopped the substance abuse.  *Id.*  Credibility determinations in cases involving substance abuse do not differ from credibility determinations in other cases.  *Id.* (citing SSR 96-7p for guidance).

In the present case, although the ALJ found that Blaylock suffered from serious impairments other than his substance abuse and that those impairments would produce the symptoms Blaylock alleges, the ALJ also found that Blaylock's statements about the intensity, persistence, and limiting effects of his symptoms were not fully credible to the extent they were inconsistent with the ALJ's estimate of the severity of Blaylock's

24

mental impairments in the absence of substance abuse.  The ALJ determined that, in the absence of substance abuse, Blaylock's ability to relate to others would improve, although he would still have moderate difficulties in relating to others.  The ALJ also determined that Blaylock's concentration, ability to persist, and pace of work would improve in the absence of substance abuse, although, again, he would still have difficulties in this area.  In addition, the ALJ determined that without the substance abuse Blaylock would have no episodes of decompensation.  The ALJ cited the reports of Davis and Dr. Rivera and the opinion of Dr. Fernandez in justifying his conclusions, all of which described the areas in which Blaylock's drinking aggravated his mental impairments. Tr. at 47, 48-49.  From his findings regarding Blaylock's mental condition absent his substance abuse, the ALJ determined that the substance abuse was material to the disability determination, because in the absence of his substance abuse Blaylock would not be disabled.

Blaylock objects to the finding that his substance abuse is material to the disability determination for two reasons:  (1) there are five occasions in the record during which Blaylock reported to the emergency room complaining of abdominal pain even though he had not been drinking and (2) when the evidence regarding a claimant's condition in the absence of substance abuse is uncertain, the presumption should favor the claimant.  The Commissioner responds that the ALJ complied with controlling regulations and longstanding policy in determining that Blaylock's substance abuse was material to both his alleged physical and mental impairments.

Despite physicians' opinions in the record that Blaylock's alcohol abuse aggravated his pancreatitis, the ALJ did not assess whether Blaylock's pancreatitis is a

physical impairment of the sort that would likely result in a reduction in Blaylock's pain if Blaylock abstained from alcohol, nor did the ALJ cite the medical opinions of treating or nontreating sources regarding the likely effects that abstinence would have on Blaylock's pain from pancreatitis.  Moreover, as the chief symptom of pancreatitis is pain, the ALJ's failure to perform a proper analysis of the credibility of Blaylock's allegations of pain further undermines the ALJ's opinion with respect to whether Blaylock would be disabled with respect to his physical impairments if the substance abuse stopped.  This case must be remanded to the ALJ to perform a complete analysis of whether Blaylock would be disabled with respect to his pain from pancreatitis if the substance abuse stopped.

Because the ALJ failed to perform a proper assessment of whether Blaylock would be disabled if the substance abuse stopped, the issue of whether the presumption should favor the claimant when the evidence regarding a claimant's condition in the absence of substance abuse is uncertain is moot.  The court need not, therefore, address that question.

VII.

For the reasons set forth above, the court REVERSES the opinion of the Commissioner and REMANDS the case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**


Date:  May 24, 2013                    s/ *Nancy A. Vecchiarelli*
                                       Nancy A. Vecchiarelli
                                       U.S. Magistrate Judge


26